## UNITED STATES *v.* SCHWIMMER.

No. 484. Argued April 12, 1929.—Decided May 27, 1929.

*Mr. Alfred A. Wheat*, with whom *Attorney General Mitchell, Assistant Attorney General Luhring,* and *Mr. Harry S. Ridgely* were on the brief, for the United States.

*Mrs. Olive H. Rabe* for respondent.

MR. JUSTICE BUTLER delivered the opinion of the Court.

Respondent filed a petition for naturalization in the District Court for the Northern District of Illinois. The court found her unable, without mental reservation, to take the prescribed oath of allegiance and not attached to the principles of the Constitution of the United States and not well disposed to the good order and happiness of the same; and it denied her application. The Circuit Court of Appeals reversed the decree and directed the District Court to grant respondent's petition. 27 F. (2d) 742.

The Naturalization Act of June 29, 1906 requires:

"He [the applicant for naturalization] shall, before he is admitted to citizenship, declare on oath in open court . . . that he will support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and bear true faith and allegiance to the same." U. S. C., Tit. 8, § 381.

"It shall be made to appear to the satisfaction of the court . . . that during that time [at least 5 years preceding the application] he has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same. . . ." § 382.

Respondent was born in Hungary in 1877 and is a citizen of that country. She came to the United States in August, 1921, to visit and lecture, has resided in Illinois since the latter part of that month, declared her intention to become a citizen the following November, and filed petition for naturalization in September, 1926. On a preliminary form, she stated that she understood the prin-

ciples of and fully believed in our form of government and that she had read, and in becoming a citizen was willing to take, the oath of allegiance. Question 22 was this: "If necessary, are you willing to take up arms in defense of this country?" She answered: "I would not take up arms personally."

She testified that she did not want to remain subject to Hungary, found the United States nearest her ideals of a democratic republic, and that she could whole-heartedly take the oath of allegiance. She said: "I cannot see that a woman's refusal to take up arms is a contradiction to the oath of allegiance." For the fulfillment of the duty to support and defend the Constitution and laws, she had in mind other ways and means. She referred to her interest in civic life, to her wide reading and attendance at lectures and meetings, mentioned her knowledge of foreign languages and that she occasionally glanced through Hungarian, French, German, Dutch, Scandinavian, and Italian publications and said that she could imagine finding in meetings and publications attacks on the American form of government and she would conceive it her duty to uphold it against such attacks. She expressed steadfast opposition to any undemocratic form of government like proletariat, fascist, white terror, or military dictatorships. "All my past work proves that I have always served democratic ideals and fought—though not with arms—against undemocratic institutions." She stated that before coming to this country she had defended American ideals and had defended America in 1924 during an international pacifist congress in Washington.

She also testified: "If . . . the United States can compel its women citizens to take up arms in the defense of the country—something that no other civilized government has ever attempted—I would not be able to comply with this requirement of American citizenship. In this

case I would recognize the right of the Government to deal with me as it is dealing with its male citizens who for conscientious reasons refuse to take up arms."

The district director of naturalization by letter called her attention to a statement made by her in private correspondence: "I am an uncompromising pacifist. . . . I have no sense of nationalism, only a cosmic consciousness of belonging to the human family." She answered that the statement in her petition demonstrated that she was an uncompromising pacifist. "Highly as I prize the privilege of American citizenship I could not compromise my way into it by giving an untrue answer to question 22, though for all practical purposes I might have done so, as even men of my age—I was 49 years old last September—are not called to take up arms. . . . That 'I have no nationalistic feeling' is evident from the fact that I wish to give up the nationality of my birth and to adopt a country which is based on principles and institutions more in harmony with my ideals. My 'cosmic consciousness of belonging to the human family' is shared by all those who believe that all human beings are the children of God."

And at the hearing she reiterated her ability and willingness to take the oath of allegiance without reservation and added: "I am willing to do everything that an American citizen has to do except fighting. If American women would be compelled to do that, I would not do that. I am an uncompromising pacifist. . . . I do not care how many other women fight, because I consider it a question of conscience. I am not willing to bear arms. In every other single way I am ready to follow the law and do everything that the law compels American citizens to do. That is why I can take the oath of allegiance, because, as far as I can find out, there is nothing that I could be compelled to do that I can not do. . . . With reference to spreading propaganda among women throughout

the country about my being an uncompromising pacifist and not willing to fight, I am always ready to tell anyone who wants to hear it that I am an uncompromising pacifist and will not fight. In my writings and in my lectures I take up the question of war and pacifism if I am asked for that."

Except for eligibility to the Presidency, naturalized citizens stand on the same footing as do native born citizens. All alike owe allegiance to the Government, and the Government owes to them the duty of protection. These are reciprocal obligations and each is a consideration for the other. *Luria* v. *United States*, 231 U. S. 9, 22. But aliens can acquire such equality only by naturalization according to the uniform rules prescribed by the Congress. They have no natural right to become citizens, but only that which is by statute conferred upon them. Because of the great value of the privileges conferred by naturalization, the statutes prescribing qualifications and governing procedure for admission are to be construed with definite purpose to favor and support the Government. And, in order to safeguard against admission of those who are unworthy or who for any reason fail to measure up to required standards, the law puts the burden upon every applicant to show by satisfactory evidence that he has the specified qualifications. *Tutun* v. *United States*, 270 U. S. 568, 578. And see *United States* v. *Ginsberg*, 243 U. S. 472, 475.

Every alien claiming citizenship is given the right to submit his petition and evidence in support of it. And, if the requisite facts are established, he is entitled as of right to admission. On applications for naturalization, the court's function is " to receive the testimony, to compare it with the law, and to judge on both law and fact." *Spratt* v. *Spratt*, 4 Pet. 393, 408. We quite recently declared that: " Citizenship is a high privilege and when doubts exist concerning a grant of it, generally at least,

they should be resolved in favor of the United States and against the claimant." *United States* v. *Manzi*, 276 U. S. 463, 467. And when, upon a fair consideration of the evidence adduced upon an application for citizenship, doubt remains in the mind of the court as to any essential matter of fact, the United States is entitled to the benefit of such doubt and the application should be denied.

That it is the duty of citizens by force of arms to defend our government against all enemies whenever necessity arises is a fundamental principle of the Constitution.

The common defense was one of the purposes for which the people ordained and established the Constitution. It empowers Congress to provide for such defense, to declare war, to raise and support armies, to maintain a navy, to make rules for the government and regulation of the land and naval forces, to provide for organizing, arming and disciplining the militia, and for calling it forth to execute the laws of the Union, suppress insurrections and repel invasions; it makes the President commander in chief of the army and navy and of the militia of the several States when called into the service of the United States; it declares that a well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed. We need not refer to the numerous statutes that contemplate defense of the United States, its Constitution and laws by armed citizens. This Court, in the *Selective Draft Law Cases*, 245 U. S. 366, speaking through Chief Justice White, said (p. 378) that "the very conception of a just government and its duty to the citizen includes the reciprocal obligation of the citizen to render military service in case of need. . . ."

Whatever tends to lessen the willingness of citizens to discharge their duty to bear arms in the country's defense detracts from the strength and safety of the Government.

And their opinions and beliefs as well as their behavior indicating a disposition to hinder in the performance of that duty are subjects of inquiry under the statutory provisions governing naturalization and are of vital importance, for if all or a large number of citizens oppose such defense the "good order and happiness" of the United States can not long endure. And it is evident that the views of applicants for naturalization in respect of such matters may not be disregarded. The influence of conscientious objectors against the use of military force in defense of the principles of our Government is apt to be more detrimental than their mere refusal to bear arms. The fact that, by reason of sex, age or other cause, they may be unfit to serve does not lessen their purpose or power to influence others. It is clear from her own statements that the declared opinions of respondent as to armed defense by citizens against enemies of the country were directly pertinent to the investigation of her application.

The record shows that respondent strongly desires to become a citizen. She is a linguist, lecturer and writer; she is well educated and accustomed to discuss governments and civic affairs. Her testimony should be considered having regard to her interest and disclosed ability correctly to express herself. Her claim at the hearing that she possessed the required qualifications and was willing to take the oath was much impaired by other parts of her testimony. Taken as a whole it shows that her objection to military service rests on reasons other than mere inability because of her sex and age personally to bear arms. Her expressed willingness to be treated as the Government dealt with conscientious objectors who refused to take up arms in the recent war indicates that she deemed herself to belong to that class. The fact that she is an uncompromising pacifist with no sense of nation-

alism but only a cosmic sense of belonging to the human family justifies belief that she may be opposed to the use of military force as contemplated by our Constitution and laws. And her testimony clearly suggests that she is disposed to exert her power to influence others to such opposition.

A pacifist in the general sense of the word is one who seeks to maintain peace and to abolish war. Such purposes are in harmony with the Constitution and policy of our Government. But the word is also used and understood to mean one who refuses or is unwilling for any purpose to bear arms because of conscientious considerations and who is disposed to encourage others in such refusal. And one who is without any sense of nationalism is not well bound or held by the ties of affection to any nation or government. Such persons are liable to be incapable of the attachment for and devotion to the principles of our Constitution that is required of aliens seeking naturalization.

It is shown by official records and everywhere well known that during the recent war there were found among those who described themselves as pacifists and conscientious objectors many citizens—though happily a minute part of all—who were unwilling to bear arms in that crisis and who refused to obey the laws of the United States and the lawful commands of its officers and encouraged such disobedience in others. Local boards found it necessary to issue a great number of noncombatant certificates, and several thousand who were called to camp made claim because of conscience for exemption from any form of military service. Several hundred were convicted and sentenced to imprisonment for offenses involving disobedience, desertion, propaganda and sedition. It is obvious that the acts of such offenders evidence a want of that attachment to the principles of the Constitution of which

the applicant is required to give affirmative evidence by the Naturalization Act.

The language used by respondent to describe her attitude in respect of the principles of the Constitution was vague and ambiguous; the burden was upon her to show what she meant and that her pacifism and lack of nationalistic sense did not oppose the principle that it is a duty of citizenship by force of arms when necessary to defend the country against all enemies, and that her opinions and beliefs would not prevent or impair the true faith and allegiance required by the Act. She failed to do so. The District Court was bound by the law to deny her application.

*The decree of the Circuit Court of Appeals is reversed.*

*The decree of the District Court is affirmed.*

Mr. Justice Holmes, dissenting.

The applicant seems to be a woman of superior character and intelligence, obviously more than ordinarily desirable as a citizen of the United States. It is agreed that she is qualified for citizenship except so far as the views set forth in a statement of facts "may show that the applicant is not attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the same, and except in so far as the same may show that she cannot take the oath of allegiance without a mental reservation." The views referred to are an extreme opinion in favor of pacifism and a statement that she would not bear arms to defend the Constitution. So far as the adequacy of her oath is concerned I hardly can see how that is affected by the statement, inasmuch as she is a woman over fifty years of age, and would not be allowed to bear arms if she wanted

to. And as to the opinion, the whole examination of the applicant shows that she holds none of the now-dreaded creeds but thoroughly believes in organized government and prefers that of the United States to any other in the world. Surely it cannot show lack of attachment to the principles of the Constitution that she thinks that it can be improved. I suppose that most intelligent people think that it might be. Her particular improvement looking to the abolition of war seems to me not materially different in its bearing on this case from a wish to establish cabinet government as in England, or a single house, or one term of seven years for the President. To touch a more burning question, only a judge mad with partisanship would exclude because the applicant thought that the Eighteenth Amendment should be repealed.

Of course the fear is that if a war came the applicant would exert activities such as were dealt with in *Schenck v. United States,* 249 U. S. 47. But that seems to me unfounded. Her position and motives are wholly different from those of Schenck. She is an optimist and states in strong and, I do not doubt, sincere words her belief that war will disappear and that the impending destiny of mankind is to unite in peaceful leagues. I do not share that optimism nor do I think that a philosophic view of the world would regard war as absurd. But most people who have known it regard it with horror, as a last resort, and even if not yet ready for cosmopolitan efforts, would welcome any practicable combinations that would increase the power on the side of peace. The notion that the applicant's optimistic anticipations would make her a worse citizen is sufficiently answered by her examination, which seems to me a better argument for her admission than any that I can offer. Some of her answers might excite popular prejudice, but if there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free

thought—not free thought for those who agree with us but freedom for the thought that we hate. I think that we should adhere to that principle with regard to admission into, as well as to life within this country. And recurring to the opinion that bars this applicant's way, I would suggest that the Quakers have done their share to make the country what it is, that many citizens agree with the applicant's belief and that I had not supposed hitherto that we regretted our inability to expel them because they believe more than some of us do in the teachings of the Sermon on the Mount.

Mr. Justice Brandeis concurs in this opinion.

Mr. Justice Sanford, dissenting.

.. I agree, in substance, with the views expressed by the Circuit Court of Appeals, and think its decree should be affirmed.