## In re BEALE.
### No. 2361.

District Court, D. Minnesota, Third Division.
March 1, 1933.

Thomas Frederick Rutledge Beale, for petitioner.

James P. Greeley, of St. Paul, Minn., for the United States.

JOYCE, District Judge.

Objection has been made by the government to the naturalization of the within petitioner, Rev. T. F. Rutledge Beale, on the grounds: First, that he is a conscientious objector; second, that he is not willing to take the oath of allegiance without qualification; and, third, that he is not attached to the principles of the Constitution of the United States. This objection is based on the petitioner's answer to question 24 of the preliminary application for petition for naturalization. The question and Dr. Beale's answer are as follows:

"24. If necessary, are you willing to take up arms in defense of this country?"

"As per Paris Pact (please see explanation attached).

"In order that no question may arise concerning the Oath of Allegiance, I add this explanatory word. I am conscientiously opposed to war as a method of settling international controversies. I understand that, since the Kellogg Peace Treaty (the Pact of Paris) came into effect as international law, one's allegiance to the Constitution is not prejudiced by his unwillingness to accept a hypothetical obligation in regard to the now delegalized institution of war. In the Pact of Paris, which was negotiated by our Government, and proclaimed by President Hoover on July 24, 1929, the United States, jointly with the other nations of the world, condemned recourse to war, renounced war as an instrument of national policy, and agreed never to seek the settlement or solution of any international dispute or conflict except by pacific means. I fully approve and support the Kellogg Peace Treaty, the object of which was officially stated by Secretary Kellogg when he declared that 'the United States de-

sires to see the institution of war abolished,' and offered to conclude this treaty for that purpose. I understand that, under the Constitution, This Treaty is now part of the supreme law of the land. As a conscientious objector to war I believe that I am patriotically in accord with the Constitution, and I promise to defend it against all enemies."

The petitioner in the first of his two briefs amended this statement, the principal effect of which was to abandon his position as a conscientious objector, and it now reads:

"In order that no question may arise concerning my full attachment to the principles of the constitution, I add this explanatory word. I condemn and oppose war as a method of settling international controversies. I understand that, since the Kellogg Peace Treaty (the Pact of Paris) came into effect as international law, ones allegiance to the constitution is not prejudiced by his unwillingness to accept a hypothetical obligation in regard to the now delegalized institution of war. In the Pact of Paris, which was negotiated by our Government, and proclaimed by President Hoover on July 24, 1929, the United States, jointly with the other nations of the world, condemned recourse to war, renounced war as an instrument of national policy and agreed never to seek the settlement or solution of any international dispute or conflict except by pacific means. The object of this treaty was officially stated by Secretary Kellogg when he declared 'that the United States desires to see the institution of war abolished,' and offered to conclude this treaty for that purpose. I fully approve and support this treaty which I understand is now, under the constitution, part of the supreme law of the land. I am patriotically in accord with the constitution and I promise to defend it against all enemies."

The government in its reply brief reiterated its objection on all the grounds originally urged.

The applicant has filed two statements or memoranda of some thirty legal pages, which must be considered in conjunction with the answer to question 24, supra, as well as the answers made to the questions asked the applicant in open court at the final hearing on his petition March 1, 1933, which questions and Dr. Beale's answers were as follows:

"Q. I should like, in so far as you can, to have you first answer the questions by 'yes,' or 'no,' and then if you desire you may make such elaboration on your answers as you see fit. Is it your view that the Constitution has been modified by the Pact of Paris? A. The statutory requirements for naturalization have been modified by the Pact of Paris.

"Q. Do you believe, irrespective of the stress or necessity existing, you would possess the right if admitted to citizenship to withhold from the Government military service when your best judgment suggested you so do? A. I can't anticipate that situation, your Honor. We are dealing with term 'military service,' naturally an institution which is now outlawed.

"Q. Assuming that this Government observes all provisions of the Pact of Paris and assuming further some other nation does otherwise and in fact by armed force attacks this country, under such circumstances would you bear arms if called upon so to do? A. I believe that allegiance to and support of the Constitution and laws of the United States demands I do not anticipate that other signatories to that Pact with the United States will break their word any more than I anticipate the United States will break its word.

"Q. I would gather, in the light of the answers which you have given that the position heretofore taken by you in the first instance in answer to Question 24, and as thereafter expressed in the two briefs which you filed with me, is maintained by you at this time? A. Yes, sir."

These questions were asked to afford applicant full opportunity to clearly state his position, and they seemed the most direct manner of developing his state of mind regarding his absolute and unqualified acceptance of our Constitution and its principles. The answers given are of record and harmonize with the position maintained throughout by Dr. Beale, but in my view are not in harmony with the Constitution or statutory requirements.

The position of the applicant, as I understand it, is, in substance, that while he asserts he is fully attached to the principles of the Constitution, he adds by way of explanation or limitation his understanding that since the Kellogg Peace Treaty, commonly known as the Pact of Paris (46 Stat. 2343), came into effect as international law, one's allegiance to the Constitution is not prejudiced by his unwillingness to accept a hypothetical obligation in regard to the now delegalized institution of war, because so doing is to anticipate that this government or some other government signatory to the Pact may violate its sacred obligation; further that this government should not assume that he would be

unwilling to bear arms under any circumstances (though nowhere does it appear what the circumstances are under which he would be willing to bear arms); nor does his position imply that it is morally wrong to use force in the common defense, but his involvement or participation in that defense is in the light of the Pact of Paris. Quoting from applicant's brief: "Therefore, standing with the Government within the solemn commitments of the Pact, he declines to attempt to envisage the circumstances under which the bearing of arms in war would be required. To do so would imply doubt as to the good faith of the signatories of the Pact," and "That a whole hearted support of the Pact is the most efficient and most patriotic defense of the country."

The petitioner further states that: " 'To defend the Constitution' expresses the abiding spirit of patriotism, but the means and methods of so doing necessarily vary with the passing of time and the changes of circumstance. Weapons and methods and strategy are not constant."

The jurisdiction of this court attaches to this proceeding by virtue of section 357, title 8, of the United States Code Annotated.

Section 372, title 8, USCA, recites that an alien may be admitted to become a citizen of the United States in the manner indicated in sections 372 to 394 of this Title, and not otherwise.

The terms of the oath required to be taken by candidates for citizenship are found in title 8, § 381, USCA.

The statute dealing with evidence of residence, character, and attachment to the principles of the Constitution is found in title 8, § 382, USCA.

■■ It will be seen, therefore, that, in exercising the jurisdiction conferred, the court must find the petitioner to be attached to the principles of the Constitution without any limitation or qualification whatever, for none is contained in the statute. Also must I find that applicant's declaration to support and defend the Constitution is without any reservation or qualification, for none is contained in the statute.

I have not found it easy to harmonize the expression of applicant's views in his written submission with the conclusion he expressed as to his willingness "to take the oath of allegiance." Attachment to the principles of the Constitution and willingness to take the prescribed oath seem somewhat diluted in view of the applicant's statement as to his understanding of the Kellogg Peace Pact and the nonprejudice attaching to his unwillingness to accept a hypothetical obligation regarding outlawed war, and the further statement that "he declines to attempt to envisage the circumstances under which the bearing of arms in war would be required," and, further, "the undesirability of accepting hypothetical obligations with regard to war, which action would anticipate circumstances that can arise only if one or more of the high contracting parties break their word and violate the pact."

In my view it is unimportant here whether or not applicant's views disclose a more acute sense of loyalty or suggest a more efficient means of defense of the Constitution than that contemplated by the Constitution or under the Naturalization Act (see 8 USCA §§ 381, 382). The question before the court, to again repeat it, is with reference to taking the prescribed oath to support and defend the Constitution in the sense enunciated by the Supreme Court and to accept the statutory terms regarding naturalization.

It is apparent from applicant's briefs that he views the Pact of Paris as having coincided with his views; that the national thought on the subject, through the treaty, accords with his position, and that the Constitution necessarily must be viewed in a new light; that an amendment, so to speak, must be read into it, the effect of which is to say that all future defenses of the Constitution must be pacific in character.

■ It would appear that the applicant seeks naturalization based upon his readiness to take an oath to support and defend the Constitution, not as contemplated by that instrument which recognizes and makes provision for military defense, but as contemplated by the Pact of Paris which renounces war. This is not a compliance with the statute, and I cannot accept it as such compliance.

■ It is a principle of law "that a treaty cannot change the Constitution or be held valid if it be in violation of that instrument. This results from the natural and fundamental principles of our government." Cherokee Tobacco Co. v. U. S., 11 Wall. 616, 620, 20 L. Ed. 227.

■ The Kellogg Peace Pact does not alter the Constitution of the United States. The Constitution can be altered only by the people and in the manner provided by law.

In his note of June 23, 1928, addressed to the then negotiating governments, Secretary Kellogg said as follows: "There is nothing in the American draft of an antiwar

treaty which restricts or impairs in any way the right of self-defense. That right is inherent in every sovereign state and is implicit in every treaty. Every nation is free at all times and regardless of treaty provisions to defend its territory from attack or invasion and it alone is competent to decide whether circumstances require recourse to war in self-defense"—which is reiterated in his letter addressed to Dr. Beale appearing in the files in this proceeding.

The correspondence between the signatory nations generally reveals that by reservation or interpretation they uniformly and expressly reserved the right of self-defense. As illustrative, the British note of May 19, 1928, addressed to the American Ambassador, in paragraph 10 accepts the Pact "upon the distinct understanding that it does not prejudice their freedom of action in this respect." The paragraph reads in part as follows:

"10. The language of Article 1, as to the renunciation of war as an instrument of national policy, renders it desirable that I should remind your excellency that there are certain regions of the world the welfare and integrity of which constitute a special and vital interest for our peace and safety. His Majesty's Government have been at pains to make it clear in the past that interference with these regions cannot be suffered. Their protection against attack is to the British Empire a measure of self-defense. It must be clearly understood that his Majesty's Government in Great Britain accept the new treaty upon the distinct understanding that it does not prejudice their freedom of action in this respect."

 My duty here deals, as I understand the law, with the statutes relative to naturalization wherein are dealt with relations between the state and the individual, and, until the lawmaking body changes the applicable statutes, they must govern. No individual is permitted to amend existing law by his personal interpretation thereof. As I view it, the Pact of Paris does not abrogate existing federal law affecting naturalization. I view the Constitution to be fundamental law, and that all other laws and treaties are creatures of the Constitution. The relations between the government and its naturalized citizens are reciprocal in character. The citizen has the duty of allegiance, and the government owes such citizen the duty of protection. No compulsion attends one seeking citizenship; it is a privilege granted by Congress and one which, if granted, must be

on the terms laid down by the grantor of the privilege. As the Supreme Court of the United States said in the Macintosh Case, 283 U. S. 605, 51 S. Ct. 570, 572, 75 L. Ed. 1302, it is "to be given, qualified, or withheld as Congress may determine." There may not, under the present state of our law, be limitations, reservations, or doubts in one's mind, nor may there be transferred to the individual the determination of the question as to whether the need or defense of the country requires the bearing of arms. Nor can there be reservation, mental or otherwise, or private or personal conception to be exercised with reference to the word "defend."

In the Schwimmer Case, 279 U. S. 644, 49 S. Ct. 448, 449, 73 L. Ed. 889, naturalization was denied because the applicant refused to bear arms, although she stated that she was willing "to take the oath of allegiance without reservation," and in that case the Supreme Court said: "That it is the duty of citizens by force of arms to defend our government against all enemies whenever necessity arises is a fundamental principle of the Constitution."

The situation resolves itself into a practical matter, and one cannot apply his theory of government or human relationship as the test of his duty or as determinative of his status.

In the Macintosh Case, decided May 25, 1931, 283 U. S. 605, 51 S. Ct. 570, 75 L. Ed. 1302, naturalization was denied because the applicant refused to promise in advance to bear arms in defense of the government unless he believed the war to be morally justified.

In the case of United States v. Bland, 283 U. S. 636, 51 S. Ct. 569, 570, 75 L. Ed. 1319, decided the same day as the Macintosh Case, naturalization was denied because of a refusal to take the prescribed oath without the written interpolation of the words, "as far as my conscience as a Christian will allow."

The Pact of Paris was a part of the supreme law of the land at the time of these two decisions. It is not to be presumed that the Supreme Court of the United States entertained the thought that its provisions exercised a repeal of the existing statutes applicable to those cases. If applicable then, they are applicable now. When Justice Sutherland in the Macintosh Case said: "There are few finer or more exalted sentiments than that which finds expression in opposition to war. Peace is a sweet and holy thing, and

war is a hateful and an abominable thing, to be avoided by any sacrifice or concession that a free people can make. But thus far mankind has been unable to devise any method of indefinitely prolonging the one or of entirely abolishing the other; and, unfortunately, there is nothing which seems to afford positive ground for thinking that the near future will witness the beginning of the reign of perpetual peace for which good men and women everywhere never cease to pray. The Constitution, therefore, wisely contemplating the ever-present possibility of war, declares that one of its purposes is to 'provide for the common defense' "—he expressed our national thought as to peace and recognized that there are difficulties surrounding its attainment.

The court further said: "We are a Christian people, ⁕ ⁕ ⁕ according to one another the equal right of religious freedom, and acknowledging with reverence the duty of obedience to the will of God. But, also, we are a nation with the duty to survive; a nation whose Constitution contemplates war as well as peace; whose government must go forward upon the assumption, and safely can proceed upon no other, that unqualified allegiance to the nation and submission and obedience to the laws of the land, as well those made for war as those made for peace, are not inconsistent with the will of God."

And again: "It is not within the province of the courts to make bargains with those who seek naturalization. They must accept the grant and take the oath in accordance with the terms fixed by the law, or forego the privilege of citizenship. There is no middle choice. If one qualification of the oath be allowed, the door is opened for others, with utter confusion as the probable final result."

In this character of proceeding, which is entirely a matter of statutory regulation, the Supreme Court has said that, when a doubt exists concerning the grant of citizenship, generally at least that doubt should be resolved in favor of the United States. See United States v. Manzi, 276 U. S. 463, 48 S. Ct. 328, 72 L. Ed. 654. A statute granting a privilege must be construed most strongly in favor of the grantor. See Hannibal & St. Joe R. Co. v. Mo. R. Packet Co., 125 U. S. 260, 8 S. Ct. 874, 31 L. Ed. 731; and Swan & Finch Co. v. U. S., 190 U. S. 143, 23 S. Ct. 702, 47 L. Ed. 984.

In disposing of this application for citizenship, the court must be able to find affirmatively that the applicant is attached to the principles of the Constitution and that he is willing to take the prescribed oath without qualification or reservation. It is my belief that this alien has not conformed to these requirements. Dr. Beale's application for naturalization is therefore denied, and his petition dismissed, to which ruling he is accorded an exception.