In re MARTINEZ.

No. 2774–14875.

District Court, W. D. Pennsylvania.

July 23, 1947.

Joseph D. Ripp, of Pittsburgh, Pa., for petitioner.

Hyman Scher, of Pittsburgh, Pa., for Immigration and Naturalization Service.

WALLACE S. GOURLEY, District Judge.

This proceeding relates to a petition for naturalization filed by Jose Prieto Martinez who was born in Spain on July 25, 1898, and who legally entered the United States on April 1, 1917, and has continually resided in this country since that date. He filed his Declaration of Intention to become a citizen on February 9, 1944, and his Petition for Naturalization was filed on June 19, 1946.

It appears that during the period of more than thirty years that the petitioner resided in the United States, he has not been involved in any trouble or difficulty. However, in connection with the investigation which was made after the filing of the Petition for Naturalization, certain facts were discovered by the government which resulted in the recommendation being made to the Court that the Petition for Naturalization be denied.

It appears that subsequent to the declaration of war in December of 1941, the petitioner resided at Hollidayscove, West Virginia. On the 19th day of May, 1942, the petitioner filed with Local Draft Board No. 1, Hancock County, West Virginia, his alien's personal history. On July 2, 1942, he was found acceptable for military service. On July 13, 1942, he was mailed the Notice of Alien's Acceptability. On August 4, 1942, he signed D.S.S. Form 301, which was the application for relief from military service on the basis that he was a Spanish citizen or an alien of a neutral country, and on the basis thereof claimed exemption from military service. At the time this application was filed, the petitioner was employed at the Weirton Steel Company, Weirton, West Virginia, and when the employer ascertained this fact, the petitioner was discharged from his employment. As a result thereof on August 18, 1942, the petitioner signed D.S.S. Form 165 which was an application for voluntary induction. He requested leave to withdraw the application previously signed on August 4, 1942, to be relieved from military service on the basis of being an alien of a neutral country. As a result of the filing of the petition for voluntary induction, the petitioner was ordered to report for induction on September 10, 1942. It was determined that a physical condition existed which made him unacceptable for military service, and at his own expense he underwent a major abdominal operation for a hernia condition. As a result thereof, induction was deferred to March 1, 1943, prior to which time all men over thirty-eight were relieved from military service. The petitioner had no further obligation to report for induction.

The petitioner contends that after he received his notice of alien's acceptability for military service on July 13, 1942, he discussed with other persons who were also Spanish citizens (and, therefore, citizens of a neutral country during World War II) the eligibility of neutral aliens to serve in the Armed Forces of the United States. He followed the suggestion of friends in communicating with the Spanish Consul at New York inquiring as to the rights of neutral aliens. He further states that he was informed by the Spanish Consul that he should appear at the draft board and execute Form 301 which was the application for relief from military service on the basis of him being an alien of the neutral country of Spain. Petitioner further states that the draft board did receive a copy of the Spanish Consul's letter regarding the execution of Form 301, which fact is denied by the government, and in connection with which no proof has been offered in support thereof by the petitioner except his oral statement. However, there does appear in the file of the Bureau of Naturalization a let-

ter written by the Spanish Consul, located at Philadelphia, Pennsylvania, dated October 15, 1942, to the petitioner which relates to the procedure to be followed as an alien of neutral Spain. This letter was given to the government by the petitioner. This is the letter which the petitioner states he received from the Spanish Consul in answer to his inquiry as to the procedure which he should follow.[1]

The petitioner further contends that when he appeared before the draft board on August 4, 1942, he was given Form 301 which he signed without discussing the contents thereof. Form 301 which was signed by the petitioner has not been introduced in evidence in the case, and there is nothing in the record to contradict the petitioner that he did not prepare the form in his own handwriting. He does not deny signing such a form, but claims that when he appeared at the draft board, the draft board having received a copy of the Spanish Consul's letter, already knew that he was to ex-

ecute said form. That his only act on August 4, 1942, was to sign the form, without knowledge of its detailed contents, he not having read it nor was it read to him. Said application is executed under oath, and requires the applicant to set forth under oath his full name, his residence, the draft board with which he is registered, the order number, serial number, and the country of which the individual is a citizen or subject which was neutral in World War II, together with the alien registration number. A copy of said form is set forth in Footnote 2.[2]

The application form specifically states that the making of the application to be relieved from military service will debar the applicant from becoming a citizen of the United States.

Within a week after the application was filed, the petitioner lost his employment with the Weirton Steel Company and he contends that when he learned and appreciated the full import of the form which he executed and that the same was not man-

---

[1]"Translation No. 5455
        File 2774-P-148745 N & S
"Consulate of Spain
    "Philadelphia
        "Philadelphia, 15 October, 1942.
"Mr. Jose P. Martinez,
    "P. O. Box 202,
    "Weirton, W. Va.
"My dear sir:
    "In agreement with the Department of State in Washington, our Embassy has communicated to us new instructions with reference to the exemption for Spaniards from Military service in this country.
    "In accordance with same you will have to sign a brief which will in due time be sent to you by this Consulate, but in order that it be drawn it will be necessary for you to inform me of the number assigned to you by the Draft Board.
    "As this matter is of an urgent character I pray you to send the information requested at the earliest possible.
    "Sincerely yours,
                "The Consul:
                "/s/  E. Albela
    "The above translation from the Spanish language was made by the undersigned.
"/s/  S. C. Reina    Date July 15, 1946
"S. C. Reina, Interpreter
"Immigration and Naturalization Service"

[2]            Date received ——, 194—
    Application by Alien for Relief from
                Military Service
County of ————— ⎫
State of  ————— ⎬ ss:
    I, —————————————————————
        (First Name)       (Middle name)
————————— do solemnly swear—affirm—
(Surname)
that I reside at ——————, ——————,
                        (City)       (County)
——————; that I am registered with
(State)
Local Board ——————, ——————,
                (Number)       (City)
——————, ——————; that my order
(County)    (State)
number is —————— and serial number
is ——————; and that I am a citizen
or subject of ——————, which is neu-
                (Country)
tral in the present war.
My alien registration number is ——————
    I do hereby make application to be relieved from liability for training and service in the land or naval forces of the United States, under the Selective Training and Service Act of 1940, as amended, in accordance with the act of Congress, approved December 20, 1941. I understand that the making of this application to be relieved from such liability will debar me from
becoming a citizen of the United States.
I —————————————— filed a declara-
        (have) or    (have not)
tion of intention to become a citizen of the United States.

datory by an alien of a neutral country, he appeared at the draft board some two weeks later, on or about August 18, 1942, demanded cancellation and requested permission to be voluntarily inducted.

At the time of his hearing before an examiner of the Naturalization Bureau on June 19, 1946, petitioner stated that the procedure which he followed was based on the recommendation of the Spanish Consul in answer to his inquiry, and that he became ashamed after losing his job, and, realizing the seriousness of his act, he immediately requested the withdrawal and offered to report for voluntary induction.

The petitioner contends that he believes in the form of government of the United States, that he approves of the same and will be true and faithful to the oath of allegiance required of a citizen. The government contends that citizenship should be denied for the reason that the petitioner is ineligible for naturalization by virtue of the provisions of Section 3(a) of the Selective Service and Training Act of 1940, as amended, 50 U.S.C.A.Appendix, § 303, Subsection (a), said part of the section which relates to the question now before the Court being as follows:

"Sec. 3 (a) Except as otherwise provided in this Act, every male citizen of the United States, and every other male person residing in the United States, who is between the ages of twenty and forty-five at the time fixed for his registration, or who attains the age of twenty after having been required to register pursuant to section 2 of this Act, shall be liable for training and service in the land or naval forces of the United States: Provided, That any citizen or subject of a neutral country shall be relieved from liability for training and service under this Act if, prior to his induction into the land or naval forces, he has made application to be relieved from such liability in the manner prescribed by and in accordance with rules and regulations prescribed by the President, but any person who makes such application shall thereafter be debarred from becoming a citizen of the United States * * *."

■ The ambition and dream of many people in foreign lands that one day they may be American citizens is a matter of common knowledge of which the courts will take judicial notice. For it is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and importance. By many it is regarded as the highest hope of civilized men. Schneiderman v. United States, 320 U.S. 118, 122, 63 S.Ct. 1333, 87 L. Ed. 1796.

■ By the petition for naturalization a case is presented for the exercise of the judicial power under the Constitution, to which the United States is a proper, and always a possible, adverse party. Tutun v. United States, 270 U.S. 568, 576, 577, 46 S.Ct. 425, 70 L.Ed. 738.

■ Naturalization is the act of adopting a foreigner and clothing him with the privileges of a native citizen. The grant of citizenship or the provisions thereof are to be construed in favor of the government and against the party claiming the grant. As a result thereof, the United States is entitled to the benefit of any doubt which remains in the minds of the Court as to any essential matter of fact. United States v. Harbanuk, 2 Cir., 62 F.2d 759.

Before a person is admitted to citizenship, he must declare on oath in open court that he will support the Constitution of the United States, and that he absolutely and entirely renounces and abjures all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly to the prince, potentate, state, or sovereignty of which he was heretofore a citizen or subject; that he will support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and bear true faith and allegiance to the same.

It shall be made to appear to the satisfaction of the Court admitting any alien to citizenship that immediately preceding the date of his application he has resided continuously within the United States five years at least, and within the State or Territory where such court is at the time held one year at least, and that during that six months time he has behaved as a man of good moral character, attached to the prin-

ciples of the Constitution of the United States, and well disposed to the good order and happiness of the same. In addition to the oath of the applicant, the testimony of at least two witnesses, citizens of the United States, as to the facts of residence, moral character, and attachment to the principles of the Constitution shall be required.

Naturalization is a privilege, to be given, qualified or withheld as Congress may determine, and which the alien may claim as of right only upon compliance with the terms which Congress imposes. That Congress regarded the admission to citizenship as a serious matter is apparent from the conditions and precautions with which it carefully surrounded the subject. Thus, among other provisions, it is required that the applicant not only shall reside continuously within the United States for a period of at least five years immediately preceding his application, but shall make a preliminary declaration of his intention to become a citizen at least two years prior to his admission. He must produce the testimony of witnesses as to the facts of residence, moral character and attachment to the principles of the Constitution, and in open court take an oath renouncing his former allegiance and pledging future allegiance to the United States. At the final hearing in open court, he and his witnesses must be examined under oath, and the government may appear for the purpose of cross-examining in respect of "any matter touching or in any way affecting his right to admission," introduce countervailing evidence, and be heard in opposition.

In specifically requiring that the court shall be satisfied that the applicant, during his residence in the United States, has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, etc., it is obvious that Congress regarded the fact of good character and the fact of attachment to the principles of the Constitution as matters of the first importance. The applicant's behavior is significant to the extent that it tends to establish or negative these facts.

But proof of good behavior does not close the inquiry. Why does the stat-ute require examination of the applicant and witnesses in open court and under oath, and for what purpose is the government authorized to cross-examine concerning any matter touching or in any way affecting the right of naturalization? Clearly, it would seem, in order that the court and the government, whose power and duty in that respect these provisions take for granted, may discover whether the applicant is fitted for citizenship; and to that end, by actual inquiry, ascertain, among other things, whether he has intelligence and good character; whether his oath to support and defend the Constitution and laws of the United States, and to bear true faith and allegiance to the same, will be taken without mental reservation or purpose inconsistent therewith; whether his views are compatible with the obligations and duties of American citizenship; whether he will upon his own part observe the laws of the land; whether he is willing to support the government in time of war, as well as in time of peace, and to assist in the defense of the country, not to the extent or in the manner that he may choose, but to such extent and in such manner as he lawfully may be required to do. These, at least, are matters which are of the essence of the statutory requirements, and in respect of which the mind and conscience of the applicant may be probed by pertinent inquiries, as fully as the court, in the exercise of a sound discretion, may conclude is necessary. United States v. Macintosh, 283 U.S. 605, 614, 615, 616, 617, 51 S.Ct. 570, 75 L.Ed. 1302; United States v. Schwimmer, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed 889.

In addition to the provisions in the Selective Service Act which debars an alien of a neutral country to citizenship where he elects to claim an exemption from military service, in this proceeding as in all naturalization proceedings it is the duty of the Court to determine whether or not the petitioner during all of the period of five years immediately preceding the date of the application for citizenship, which would be between the period of June, 1941, and June 19, 1946, was a person attached to the principles of the Constitution of the United States. Furthermore, was the pe-

titioner disposed to the good order and happiness of the United States, since before naturalization can be granted it is necessary that the petitioner possess the qualifications described by the law of the United States relative to the naturalization of aliens. The controlling questions, therefore, are:

1. Whether or not the action of the petitioner in claiming exemption from military service of the United States during World War II debars the petitioner from citizenship where he subsequently withdraws said application and offers himself for voluntary induction?

2. Was the action of the petitioner in claiming his exemption from military service of the United States during World War II such evidence of absence of friendly attitude toward the United States to show conclusively that he lacked one of the legal qualifications for admission to citizenship—that he must be attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of this country?

Counsel for the defendant has cited the case of United States v. Siem, 9 Cir., 299 F. 582, in support of the contention that citizenship should be granted. This case is definitely distinguishable from the case at bar for the reason that it arose under the Selective Draft Law of May 18, 1917, C. 15, 40 Stat. 76, as amended, 50 U.S.C.A. § 226 note, 50 U.S.C.A.Appendix, § 201 et seq.

The first legislation dealing with neutral aliens was enacted during the period of World War I. This was Section 4 of the Act of July 9, 1918, c. 143, subc. 12, 40 Stat. 885, 50 U.S.C.A. § 226 note, 8 U.S.C.A. § 366, which read as follows:

"Provided further, That a citizen or subject of a country neutral in the present war who has declared his intention to become a citizen of the United States shall be relieved from liability to military service upon his making a declaration, in accordance with such regulations as the President may prescribe, by withdrawing his intention to become a citizen of the United States, which shall operate and be held to cancel his declaration of intention to become an American citizen, and he shall forever be debarred from becoming a citizen of the United States."

A provision in identical words is contained in Section 1 of the Act of August 31, 1918, 40 Stat. 955.

This ban was modified by the Act of February 11, 1931, 46 Stat. 1087, 8 U.S.C. § 366a, which contained the following provision:

"That, notwithstanding any provision of law to the contrary, no alien shall be debarred from becoming a citizen of the United States on the ground that he withdrew his intention to become a citizen of the United States in order to secure discharge from the military service, if such withdrawal (and the application therefor) and discharge took place after November 11, 1918."

The foregoing provisions were repealed by Section 504 of the Nationality Act of 1940, 54 Stat. 1173, 8 U.S.C.A. § 904.

The Court in the Siem case, supra, held that citizenship should not be denied under the Selective Service Act or Draft Law then existing for the reason that Congress did not specifically so express where the alien had not previously filed a Declaration of Intention. This same ruling in construing the Acts in effect during World War I was made in the case of Tutun v. United States, 1 Cir., 12 F.2d 763. This case is distinguishable from the case at bar for the reasons just given.

I do not believe the case Petition of Kohl, 2 Cir., 146 F.2d 347, should govern the matter now before the Court. The petitioner in that case was an alien of the country of Germany, he registered with the draft board and was classified 1-A. He requested the draft board to reconsider his classification and advanced three grounds: That he was married; that he was contributing to the support and maintenance of his mother, and that the loss of his employment would cause him undue hardship. The local board denied his request for reclassification, an appeal was taken and he was reclassified 3-A. Subsequent to his 3-A classification, he was at various times

classified as 4–C on account of his alien status, 3–A on account of being engaged in essential work and 2–B as a defense worker. He was later reclassified as 1–A. He reported for induction and filed his indication that he was willing to fight for this country, which was necessary to do due to the fact that he was an alien. He was rejected by the Army doctors and re-classified as 4–F. The Court held that although the alien was temporarily successful in legitimately obtaining deferment from induction into military service, it could not serve as a basis for denying his petition for naturalization. The fact that the alien took advantage of the privileges expressly afforded by the law, was no reason why the Court should find him wanting in some higher degree of patriotism as he basis for denying the petition for naturalization. Under the circumstances just cited, the Circuit Court reversed the District Court and directed that citizenship be granted.

█ Has the petitioner fulfilled a condition which Congress has imposed on every applicant for naturalization—that during the five years preceding his application he had behaved as a man, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same? The question then is not of petitioner's opinions or beliefs—save as they may have influenced or may explain his conduct showing attachment, or want of it, to the principles of the Constitution. My concern is only that the declared will of Congress shall prevail —that no man shall become a citizen or retain his citizenship whose behavior for five years before his application does not show attachment to the principles of the Constitution. In determining whether the petitioner is attached to the constitutional principles, the Court must look as the statute admonishes, to see whether in the five year period the petitioner has behaved as a man attached to those principles. The attachment or want of it is of personal attribute to be inferred from the relevant facts and circumstances which tend to reveal the petitioner's attitude toward those principles. United States v. Kusche, D.C., 56 F.Supp. 201, 239.

The Act of Congress which the Court is called upon to interpret in the instant case, Act of September 16, 1940, 54 Stat. 885, as amended, 50 U.S.C.A.Appendix, § 303, specifically provides—and without reserva-tion—that any citizen or subject of a neutral country who requests deferment from military service on the basis of alienship, is debarred from citizenship if an application is made.

█ The Nationality Act, 8 U.S.C.A. § 501 et seq., should be strictly enforced and with uniformity, in view of the express requirements of the Constitution that the rule of naturalization shall be uniform. In re Tomarchio, D.C., 269 F. 400.

One of the primary functions of the federal government, as stated in the Preamble to the Constitution, was to "provide for the common defense." The right to raise and support armies was expressly conferred upon the Congress by the Constitution. In the attempt of Congress to provide for the common defense and to raise an army, it enacted the Selective Training and Service Act of 1940, Secs. 301–318, Title 50 U.S.C.A.Appendix, and the Service Extension Act of 1941, Secs. 351–362, Title 50 U.S.C.A.Appendix. Section 303 states that every male citizen of the United States, and every other male person residing in the United States, who is within the prescribed age limits at the time fixed for his registration shall be liable for training and service in the land and naval forces of the United States, except as otherwise provided in the Act. Under the Selective Draft Act of 1917, 50 U.S. C.A.Appendix, § 201 et seq., the local board had the power to defer registrants from the military service, but under the Selective Service and Training Act of 1940, the local board can exempt no one from service. It may defer, but it cannot exempt. The duty is upon every male citizen to serve unless Congress has by the statute exempted the registrant from the service. Every male person must register and none are exempt from registration except those already in the military service or expressly mentioned in Section 305. No male person other than a minister of religion and students preparing for the ministry under cer-

tain conditions are deferred by the Act. The Vice President, Governors, and officers of the National and State Governments are not even exempt, but are, "while holding such offices, * * * deferred from training and service under this Act." The Act also provides that no exception or exemption of deferment shall continue after the cause therefor ceases to exist. It is the legal duty, therefore, of every male citizen of the United States, within the age group, to serve, as and when ordered, except a minister of religion. Lehr v. United States, 5 Cir., 139 F.2d 919.

The Court in the case just cited did not have occasion to consider the problem now before this Court, but I believe the phraseology above expressed should be referred to and considered in disposing of this proceeding.

■ The obligation to render military service is inherent in citizenship and may be compared with the obligation of a father to support his children. Self v. United States, 4 Cir., 150 F.2d 745.

In the consideration of a case of this nature, I believe the Court must take notice of the physchological phenomena which existed during the war as compared with the condition which now exists. Many aliens and individuals who now desire citizenship, during the war pleaded their alien status in bar to the performance of military duty and are now found most vehement in their protestations of loyalty, and of their yearning to take up arms in defense of the country of their adoption. Fighting ceased approximately two years ago, and there is now no longer any danger attached to the tardy proffers of military assistance. When soldiers were needed, however, these fair-weather friends were to be found tying the hands of the local draft boards through pleading their alien status. It is known now, their war records as made up by their questionnaires and applications made from time to time, work an injustice due to the fact that the claims made therein are inconsistent with their real mental attitude. Claim is made that in very considerable numbers of instances, more or less incompetent scriveners had been employed by the draft boards and that said employees did not properly instruct, advise or explain to registrants the meaning and provisions of various forms or questionnaires which were signed. The Selective Service Act, however, placed on the registrant the duty of acquainting himself with all requirements under the Selective Service Act. When the registrant signed and swore to a questionnaire or any other forms which he saw fit to request, that document became his writing, and all responsibility for what may be contained therein was assumed by him.

■ It does not seem fair or reasonable to me at this late date that an individual should escape the consequences of declarations against interest contained therein, by any resort to impeachment of what may have been set forth in a questionnaire or in a form which might have been executed. This petitioner was forty-four years of age, had lived in this country for approximately 30 years and should have had sufficient intelligence and knowledge to know or inform himself of his various responsibilities and obligations under the law.

There appears in evidence a copy of a letter, under the signature of the petitioner, written to the Immigration and Naturalization Service at Philadelphia, Pennsylvania, on May 12, 1943, which indicates marked intelligence and full awareness of the proper method of expression to use in explaining a problem which existed.[3]

I do not believe this petitioner was sin-

---

[3] "Pittsburgh, Pa. May 12th, 1943
"United States Department of Justice,
"Immigration and Naturalization Service,
"Mr. Earl G. Harrison, Commissioner,
"15th & Chestnut Streets,
"Philadelphia, Pa.
"Dear Sir:
"Since I sent you on April 26th. 1943 my application for the first papers I have changed my postal address to P. O. Box 1654, Pittsburgh, Pa. and although I have been informed from Weirton, W. Va., where I used to live, that there had been received a letter from you and reforwarded to me over here, the same has not reached me and I would appreciate, therefore, if you would kindly send me a copy of your said letter to my new address mentioned above.

[redacted] 

[redacted]

cere when he stated that he did not understand what he was executing when he went to his Local Draft Board and asked to execute Form 301 which exempted him from military service as a citizen of the neutral country of Spain. No man, in my judgment, can live in the United States for 30 years and not understand and realize the responsibilities and duties of a true blooded American when this country is engaged in the conflict of war which was so great in nature that this democracy was threatened with destruction. The explanation given by the petitioner is not sound, fair, or susceptible of reason. When his employer, friends and associates learned of the actions of the petitioner and turned their backs, he became a martyr and had no alternative other than to follow the procedure which he did in withdrawing the application which he had filed. No matter where he might have gone, it would have been made known sooner or later. I believe that if his actions had not been made known to his employer, he would have rested on his rights and had been exempted from military service on the basis of the application which he filed He would have failed to carry out his responsibility to serve his country at the time of dire need.

It is my belief that those who came to America, not as mere sojourners, but with the intention of remaining here, making this land their home, availing themselves of the protection afforded by this government, and enjoying the opportunities derivable by virtue of its protecting care, owe at least a moral obligation to assist this government whenever it should be in need of their service. In consequence, with respect to those falling in that category who claimed exemption from the draft during World War II on account of the fact that they were citizens of a neutral country, whether they had previously executed a Declaration of Intention to become a citizen or not, I believe should be denied American citizenship on the ground of want of loyalty. They were so little concerned with their sense of obligation to their adopted land and its necessary defense that, in the exercise of the wide discretion conferred upon this Court, I cannot find it in my heart, in the face of their claimed exemption, although withdrawn when faced with embarrassment, to receive such a person into American citizenship. Such a person is not fitted for acceptance into the great American household of faith. In re Linder, D.C. 292 F. 1001.

The Court believes that it would be improper to read into this Act provisions which do not exist. The remedy, therefore, exists in the legislative branch of the government to expressly state that under circumstances such as exist in this case, an individual should not be debarred from citizenship.

The Petition for Naturalization is, therefore, refused. An appropriate order will be filed herewith.

[redacted]

"Thanking you in advance for this favor and asking you to kindly take note of my new address for future communications with me, I remain

"Yours respectfully,
"/s/ Joseph P. Martinez
"P. O. Box 1654
"Pittsburgh, Pa."