## In re Petition for Naturalization of CHE–TONG SONG.

### No. 1170.

United States District Court
W. D. Arkansas, Ft. Smith Division.
Jan. 29, 1957.

Jerome K. Heilbron, Ft. Smith, Ark., for petitioner.

Glenn A. Torrence, Examiner for Immigration and Naturalization Service, Dallas, Tex., for respondent.

JOHN E. MILLER, District Judge.

On January 15, 1957, the petition for naturalization of Che-Tong Song was presented to the Court. At the conclusion of the testimony the Court directed that the Examining Officer of the Immigration and Naturalization Service present his requested Findings of Fact and Conclusions of Law, and likewise requested the attorney for the petitioner to present to the Court the petitioner's requested Findings of Fact and Conclusions of Law. The requests have been duly submitted, and the Court has considered them along with the testimony and exhibits thereto introduced by the respective parties, and now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

### Findings of Fact

1.

The petition for naturalization was filed on August 8, 1955, under the provisions of Public Law 86 of the 83rd Congress, 8 U.S.C.A. § 1440a et seq., and a preliminary examination of the petitioner was conducted.

Certain disclosures made at the preliminary examination resulted in a re-

opening of the examination, and Mr. Glenn A. Torrence was duly designated Examiner of the Immigration and Naturalization Service to conduct such reopened examination, which was held in the United States Post Office and Court House Building at Fort Smith, Arkansas, on July 16, 1956. At that hearing the petitioner was present and represented by his attorney, Mr. Jerome K. Heilbron. The proceedings were reported by a duly designated stenographer.

## 2.

The petitioner was born in Tokyo, Japan, on March 24, 1929. He lived in Tokyo with his parents until he was about six years old, when the family moved to Darien, Manchuria. The petitioner's parents are Korean by birth and are Protestant Christians. His father is a mechanical engineer and his mother is a doctor. At the time of World War II the petitioner's father lost his employment as a mechanical engineer with the railroad in Manchuria, and the petitioner's mother's practice diminished to such an extent that the family was forced to return to their native land. At that time the petitioner was about 17 years of age, and had attended school while a resident of Manchuria. After the family returned to Korea the petitioner was employed by the Korean government and assigned as a civilian chaplain's assistant with the United States armed forces in Korea. Petitioner worked with a Roman Catholic chaplain and became a convert of Catholicism.

Mr. John F. Shea, Jr., of Boston, Massachusetts, was serving in the United States Army, and he and the petitioner became friends. When John F. Shea, Jr., returned to the United States, he advised his father and mother of his friendship and interest in the petitioner, and the father and mother of young Shea became interested to such an extent that they rendered assistance to the petitioner to come to the United States and enter Newman Preparatory School, a Catholic endowed school, located in Boston, Massachusetts. He was admitted to the United States on August 26, 1948, as a student and has remained in the United States since that time. He proved to be an excellent student, and upon his graduation from Newman Preparatory School he received a scholarship to Dartmouth College and immediately entered the college. While studying at Dartmouth College he associated freely with the other students. One of the students was a man named Colin Raubeson, who was attending college under the GI Bill. Raubeson was about 37 or 38 years of age, married, and the father of three children. Apparently the petitioner associated more or less with Raubeson for approximately ten months. At times Raubeson borrowed money from petitioner, claiming that the money was needed for Raubeson's family. At that time petitioner did not suspect Raubeson, but in retrospect petitioner is of the opinion that Raubeson was probably a Communist.

## 3.

During his studies at Dartmouth, the petitioner read many books on philosophy and higher mathematics. Included in his reading were books on Marxism, as well as other pro-Communist literature. In his junior year, in a term paper submitted as one of the requirements in a philosophy course, the petitioner concluded that certain Marxism conclusions were not predicated on a solid factual or a sound philosophical basis. In his senior year he read the Daily Worker as a part of his required reading.

## 4.

During his sophomore year at Dartmouth, the Korean War was in progress. Seoul, where the petitioner's parents resided, was captured by the North Koreans. The petitioner was advised by a clan cousin that his father and mother had been killed by American bombers. The petitioner believed the report from his clan cousin and was greatly disturbed by such information. About that time, and while he was suffering from grief, he helped type and hand out a

mimeographed pamphlet which was a plea for peace and a cessation of hostilities in Korea. At that time petitioner desired to do something to aid in the cessation of bloodshed, and did not realize the significance of the pamphlets. In retrospect petitioner realizes that the pamphlets were probably sponsored by Communists.

While suffering from grief because of the news concerning his parents, petitioner also undertook to obtain a transit visa from the Consul of Poland at New York City to go through Poland to Korea. He thought death, in the Korean language and literature, meant that a person had acquired status where his life is no longer significant, and he thought that his parents might not be dead but instead might be held as hostages in North Korea. On one of his trips to the Polish Consulate he was accompanied by Raubeson. Petitioner's thinking as expressed by his testimony is difficult to follow, but it is apparent that his activity with Raubeson at that time was largely because of his intense desire to do something for his parents whom he thought were either dead or possibly were prisoners of the Communists. He thought he might be able to secure their release or to bury them if they were dead.

On one occasion while petitioner was in New York City he was invited by an acquaintance to attend a meeting, which proved to be a meeting of the Labor Youth League. He only attended one meeting and took no part in the discussions, but merely listened to the discussions. Only about ten persons were at the meeting. At another time he attended five open public lectures in the Jefferson School of Social Science. The lectures dealt with "dialectical materialism" and the "American negro". He attended these five public lectures to learn something about Marxism for his studies, and also to learn something about the people in the event he was successful in his attempt to go to Communist-dominated North Korea.

5.

The petitioner never joined any of the organizations mentioned in Section 313 of the Immigration and Nationality Act, 8 U.S.C.A. § 1424.

6.

Upon his graduation from Dartmouth College the petitioner was awarded a scholarship in the University of Michigan. He enrolled as a student and spent about one year before he was drafted in the Army. He was inducted into the United States Army on June 28, 1954, and was serving in the Army at Camp Chaffee, Arkansas, when his petition was filed on August 8, 1955. He was honorably discharged by the Army on June 28, 1956, and immediately thereafter reenlisted, and is now serving honorably in the armed forces of the United States at Fort Chaffee, Arkansas.

7.

On December 13, 1955, while petitioner was serving his first enlistment in the Army, a Board of Inquiry was convened at Camp Chaffee (now Fort Chaffee), Arkansas, to hear and determine the following charges against the petitioner:

"That you—

"a. During the summer of 1951, you attended approximately five lectures at the Jefferson School of Social Science, an organization which was cited in 1947 by the Attorney General of the United States as an 'adjunct of the Communist Party'. See paragraph 1h of Summary of Information.

"b. In 1951, while a student at Dartmouth College, you assisted Colin Raubeson, a Communist Party sympathizer, in mimeographing and distributing Communist propaganda leaflets. See paragraph 1h of Summary of Information.

"c. During the summer of 1950, you attempted to persuade David Rafael Wang to adopt your Communist political views and to leave the United States and go to Mos-

cow. See paragraph 1f of Summary of Information.

"d. During the summer of 1950, while employed at the Lake Champlain Club, Vermont, you had in your possession a great deal of pro-Communist literature. See paragraph 1g of Summary of Information."

While the record does not reflect the formal findings of the Board of Inquiry, the petitioner was honorably discharged upon the conclusion of his first enlistment in the Army and, as heretofore stated, he immediately re-enlisted and is now honorably serving in the armed forces at Fort Chaffee, Arkansas. He has also been promoted since the hearing, so it is evident that he was cleared by the Board.

8.

The petitioner has a pleasing personality, is energetic, and seems to be desirous of obtaining a liberal education in order to qualify himself as a teacher in some of the great universities of the United States. In the pursuit of his studies at Dartmouth and since that time he has read extensively, particularly books on philosophy, mathematics, and related subjects.

Discussion

The Examiner who appeared for the Immigration and Naturalization Service, in his requested Findings of Fact and Conclusions of Law, stated:

"The question presented is whether the petitioner has established that within the period of ten years immediately prior to the filing of his petition for naturalization, he was not within the classes of persons enumerated in Section 313 of the Immigration and Nationality Act."

It is not contended that he was ever a member of any of the proscribed organizations, but the Examiner does contend that he was affiliated with the Communist Party.

Section 101(e)(2), [8 U.S.C.A. § 1101(e)(2)], defines affiliation as "the giving, loaning, or promising of support or of money or any other thing of value for any purpose to any organization shall be presumed to constitute affiliation therewith * * *."

Aliens have no natural right to become citizens, and can gain that privilege only under the terms prescribed by the Congress. The qualifications required by the Congress for admission to citizenship should be construed with the definite purpose to favor and support the Government and the law puts the burden upon every applicant "to show by satisfactory evidence that he has the specified qualifications". United States v. Schwimmer, 279 U.S. 644, 49 S.Ct. 448, 449, 73 L.Ed. 889.

In the Schwimmer case the court, beginning at page 649 of 279 U.S., at page 449 of 49 S.Ct., said:

"Every alien claiming citizenship is given the right to submit his petition and evidence in support of it. And, if the requisite facts are established, he is entitled as of right to admission. On applications for naturalization, the court's function is 'to receive testimony, to compare it with the law, and to judge on both law and fact.' Spratt v. Spratt, 4 Pet. 393, 408, 7 L.Ed. 897. We quite recently declared that: 'Citizenship is a high privilege, and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant.' United States v. Manzi, 276 U.S. 463, 467, 48 S.Ct. 328, 329, 72 L.Ed. 654. And when, upon a fair consideration of the evidence adduced upon an application for citizenship, doubt remains in the mind of the court as to any essential matter of fact, the United States is entitled to the benefit of such doubt and the application should be denied."

In the instant case the hearing was held in open court and oral testimony was introduced. Such a hearing is de-

scribed in Application of Murra, 7 Cir., 166 F.2d 605, 607, as follows:

"Thus, the hearing before the court is not for the purpose of reviewing the recommendations of the Examiner; it is a hearing de novo and it is obvious that the court must decide the issues upon the testimony which it hears, and that neither the testimony heard by the Examiner, his findings, nor his recommendation are of any consequence."

See also, Application of Murra, 7 Cir., 178 F.2d 670.

■ The Court is convinced, after considering all of the competent evidence in the record, that the petitioner has met the burden of proof and should be admitted to citizenship.

The only acts of petitioner which raise a possible issue as to his affiliation with the Communist Party are (1) his association with Colin Raubeson, who was "probably" a Communist; (2) his reading of pro-Communist literature; (3) his attempt to go to Korea; (4) his attendance at one meeting of the Labor Youth League; (5) his attendance at five lectures at the Jefferson School of Social Science; and (6) his assistance in typing and distributing peace pamphlets on one occasion.

In the Findings of Fact the Court set out the circumstances surrounding these activities of the petitioner, and the Court is convinced that such activities did not constitute affiliation with the Communist Party within the meaning of Sec. 313 of the Immigration and Nationality Act. Cf. Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103.

As opposed to these activities of petitioner the remaining evidence establishes that he has been an industrious student, has rendered excellent service in the Army, and has the necessary qualifications for making a good citizen. As above stated, a consideration of all of the evidence convinces the Court that petitioner is entitled to be admitted to citizenship.

Conclusions of Law

1.

The Court has jurisdiction of the petitioner and of the subject matter herein.

2.

The petitioner is not now and has not been at any time a member of or affiliated with the Communist Party or any other organization listed in Section 313 of the Immigration and Nationality Act, 8 U.S.C.A. § 1424.

3.

Petitioner is fully qualified and is entitled to be admitted to citizenship in the United States.

Therefore, an order should be entered today granting the petition, and the Examiner for the Immigration and Naturalization Service will present to the Court for signature such an order as soon as may reasonably be done.