In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-3624

JOHN DOE,

*Plaintiff-Appellant*,

*v.*

CITY OF LAFAYETTE, INDIANA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 4:00CV0076AS—**Allen Sharp**, *Judge.*

ARGUED FEBRUARY 11, 2002—DECIDED JUNE 27, 2003

Before RIPPLE, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* John Doe was banned for life from all park property in the City of Lafayette, Indiana—including a golf course, sports stadium, and city pools. The City did not provide notice or a hearing before instituting the ban, nor did it allow Doe to appeal its decision. Doe filed suit against the City, arguing that the ban violates his First Amendment right to freedom of thought and a fundamental right under the Fourteenth Amendment to loiter in public parks. The district court granted summary judgment in favor of the City. We reverse, finding the ban violates the First Amendment.

## I. BACKGROUND

John Doe is a convicted sex offender. His criminal history includes convictions for child molestation, voyeurism, exhibitionism, and window peeping. His last conviction was in 1991, ten years before this litigation. Doe's crimes were committed in schools, a convenience store, and outside private residences, and he claims that his urges are triggered by emotional vulnerability, typically in the late evening. As a result of these criminal convictions, Doe has been hospitalized, imprisoned, under house arrest, and on probation. He has been in active psychological treatment since 1986, and voluntarily attends a self-help group for sex offenders. Doe admits he still has fantasies about children, and his psychologist opines that he will likely have these urges for the rest of his life, although he recently began taking medication to control his sexual urges.

In January 2000, Doe was driving home from work and began to have sexual thoughts about children. He drove to a City of Lafayette park[1] and watched several youths in their early teens playing on a baseball diamond. Doe admits that, while observing them, he thought about having sexual contact with the children. After watching them for 15-30 minutes, and without having any contact with them, Doe left the park. Because he was upset about the incident, Doe contacted his psycholo-

---

[1] The dissent points out that Doe came in contact with two parks, but we think his intention in going to the first park, Columbian Park, is far from clear. Doe explained in his deposition that he lived a short distance from that park, and there is no evidence that he got out of his car or even stopped his car at the first park.

gist to report the incident.[2] He also reported the incident to his self-help group.

An anonymous source reported Doe's January visit to the park, and the thoughts he had while he was there, to his former probation officer. Following this unidentified report, the probation officer contacted the Lafayette Police Department, which prompted a conversation between the Police Chief, the Superintendent of the Lafayette Parks Department, and a City attorney regarding Doe's appearance in the park. Their discussion focused on the nature of Doe's January visit to the park and his criminal history, although all acknowledge that Doe was no longer serving a sentence or on probation.[3] As a result of this conversation, the City Parks Department issued an order permanently banning Doe from entering any City park property at any time and for any purpose under threat of arrest for trespass. The City did not provide any pre-issuance review of the ban, nor was Doe afforded an opportunity to appeal.[4]

The ban order is both geographically and temporally broad. The City of Lafayette's extensive park system

---

[2] Doe's psychologist testified that his ability to go to the park and manage his impulses is a positive step in his treatment and helps integrate Doe into a more normal lifestyle.

[3] Doe was not on probation in January 2000, and was not even restricted from entering the park during his period of house arrest a decade earlier, so we need not consider whether the restrictions imposed by the City might have been appropriate as a condition of release as part of the earlier criminal sentences. *Cf. United States v. Schave*, 186 F.3d 839, 841 (7th Cir. 1999).

[4] Although we have grave concerns about the procedural due process infirmities in the method employed by the City to issue the ban, Doe does not challenge the order on this ground. This court continues to be intrigued, as it was at oral argument, by Doe's strategic decision to forgo this straightforward claim.

includes several large parks, many smaller neighbor-
hood parks, a zoo, a golf course, a sports complex, a base-
ball stadium, and several pools. Typically, ban orders
are issued by the City against those who have vandalized
park property or interfered with park patrons. The result-
ing bans ordinarily are issued for a week or, at most,
a summer. In this case, the ban order against Doe has
no termination date.[5]

Doe sued the City seeking to lift the ban, challenging
it under the First and Fourteenth Amendments. On
cross motions for summary judgment, the district court
granted the City's motion, finding neither a violation of
the First Amendment nor a Fourteenth Amendment
problem with the ban. Doe appeals.


## II. ANALYSIS

Given the bases on which Doe appeals, we are faced
with a question not typically before a court: may a city
constitutionally ban one of its citizens from public prop-
erty based on its discovery of that individual's immoral
thoughts? This scenario is quite unusual, as it is a rare
case where thoughts, as separated from deeds, become
known. Technology has not yet produced a mind-reader,[6]
and thus most thinking, unless purposefully revealed

---

[5] Doe also has not challenged the ban on the ground that it
is unconstitutionally overbroad.

[6] The form such mind-reading technology might take was re-
cently the topic of a popular Steven Spielberg movie, *Minority
Report*. The movie depicts the year 2054, in which police rely
on three psychic "precognitives" that see crimes before they
happen. Using these projections, the police arrest and incarcerate
individuals for crimes committed only in the minds of the
arrestees.

to others, remains one's own. Unlike other cases in which the state becomes aware of an individual's mental state because of his or her actions, here the City acknowledges that Doe's own revelation of his thoughts, not any outward indication of his thinking, is the basis for its actions.

The freedom of individuals to control their own thoughts has been repeatedly acknowledged by the Supreme Court. In *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), the Court upheld a challenge by Jehovah's Witnesses to West Virginia's requirement that all schoolchildren participate in a pledge and salute honoring the United States flag. The Court ruled that such an obligation would impermissibly infringe upon "the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.* Indeed, it recognized that freedom to hold beliefs about politics, religion, and other matters is a cornerstone of liberty: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Id.*

Although Barnette's challenge to the West Virginia enactment was based on religious conviction, *id.,* the guarantee of freedom of the intellect has not been limited to beliefs concerning politics or religion. In *Stanley v. Georgia*, 394 U.S. 557 (1969), Stanley was convicted under Georgia law for possessing obscene material when pornographic films were found in his home. The Supreme Court reversed Stanley's conviction, finding a right to peruse obscene material in the privacy of one's home. *Id.* at 565-66. A central focus of the Court's discussion was the quintessential principle that the government's power does not extend to control of a person's thoughts: "a State has no business telling a man, sitting alone in his own house, what books he may read or what films

he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds." *Id.* at 565. Once again, the Court tied this freedom to fundamental principles of the First Amendment, holding that "it is wholly inconsistent with the philosophy of the First Amendment" for the government to exercise "the right to control the moral content of a person's thoughts." *Id.* at 565-66; *see United States v. Reidel*, 402 U.S. 351, 355-56 (1971) (affirming that *Stanley* focused on the "freedom of mind and thought and on the privacy of one's home")*; see also Wooley v. Maynard*, 430 U.S. 705, 714-15 (1977) (overturning requirement that license plate include phrase "Live Free or Die" under "the proposition that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all"); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234-35 (1977) (noting that "at the heart of the First Amendment is the notion that an individual should be free to believe as he will"); *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) ("The right of freedom of speech and press includes . . . freedom of thought . . . ."); *United States v. Schwimmer*, 279 U.S. 644, 654-55 (1929) (Holmes, J., dissenting) ("[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought . . . .").

Indeed, even when an individual's ideas concern immoral thoughts about child pornography, the Court has steadfastly maintained the right to think freely. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 252-53 (2002). In *Free Speech Coalition*, the Court considered federal legislation that criminalized virtual child pornography, so named because although the images appear to depict minors, they were produced without using real children. *Id.* at 239. The Court struck down the ban, finding

that Congress could not justify prohibition of the constitutionally-protected speech. *Id.* at 256. There, the fact that possession of virtual child pornography may cause sexually immoral thoughts about children was not enough to justify banning it. *Id.* at 252-53. Given the long-standing recognition by the High Court, we analyze the City of Lafayette's ban order with the principle that freedom of the mind occupies a highly-protected position in our constitutional heritage.

The City defends the ban as a measure to protect its youth from a person with a history of sex offenses whom they fear may harm the City's children. As part of this argument, the City seems to imply that Doe's thoughts about children and close proximity to them may encourage him to strike again. This fear—that thoughts alone may encourage action—is not enough to curb protected thinking. For example, in *Free Speech Coalition*, the government proposed a similar theory in defense of the ban of virtual child pornography, arguing that virtual child pornography whets the appetites of pedophiles. 535 U.S. at 253. The Court squarely rejected that theory: "The government 'cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts.' First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end." *Id.* (quoting *Stanley*, 394 U.S. at 566).[7] Although vigilance by the police in preventing crime is laudable, "[t]he prospect of crime . . . by itself does not justify laws suppressing protected speech." *Id.* at 245. We need not entertain further the exercise of determining what state interests might outweigh a

---

[7] The Court's holding in *Free Speech Coalition* directly rejects the dissent's puzzling attempt to carve out categories of thoughts that should be "unprotected" because they might relate to obscenity or may "incite" unlawful action.

person's right to think, as the City's only articulated interest in this case does not justify its ban order.[8]

We recognize that although pure thoughts are protected by the First Amendment, non-expressive actions are not. First Amendment jurisprudence is fastened upon the critical distinction between thinking and acting on those thoughts. *See, e.g.*, *Free Speech Coalition*, 535 U.S. at 253 ("[T]he Court's First Amendment cases draw vital distinctions between words and deeds, between ideas and conduct."); *Reidel*, 402 U.S. at 356 (private thoughts or fantasies are outside the First Amendment, but selling or buying obscenity in the mail is not protected activity and may be proscribed without violating the First Amendment). This explains why the dissent's reliance on cases such as *United States v. O'Brien*, 391 U.S. 367, 376 (1968), finding no First Amendment violation absent expression, is unhelpful. These cases focus on the distinction between mere conduct and expression and do not contradict long-standing principles regarding protection of thought. *Cf. Free Speech Coalition*, 535 U.S. at 253 ("The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought.").

Our conclusion is further reinforced by a fundamental understanding of the bounds of punishable action. The maxim that *cogitationis poenam nemo patitur* (no one is punishable solely for his thoughts) is a cornerstone of the

---

[8] Doe also argues that the ban order violates a constitutionally-protected freedom to loiter. *Cf. City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (plurality opinion) (remarking that the freedom to loiter for innocent purposes is protected by the Due Process Clause of the Fourteenth Amendment). In view of our holding that the ban order violates Doe's First Amendment right to freedom of thought, we find it unnecessary to reach this issue and express no view on the question.

American common law system of criminal justice that has shaped many of the constitutional boundaries of criminal law.[9] Perhaps the Victorian legal scholar James Fitzjames Stephen best explained this basic limit on government power: "If it were not so restricted it would be utterly intolerable; all mankind would be criminals, and most of their lives would be passed trying and punishing each other for offenses which could never be proved." 1 James Fitzjames Stephen, A History of the Criminal Law of England 78 (1883).

This axiomatic principle is illustrated by the discernment between punishment for a person's status—impermissible under the Eighth Amendment—and sanctions levied for a person's conduct. *See Robinson v. California*, 370 U.S. 660, 666 (1962). In *Robinson*, the Supreme Court struck down a California statute that made addiction to narcotics illegal. *Id.* at 666-67. Because the statute required no illegal act, but criminalized mere status as a drug addict, it violated the Eighth Amendment's prohibition against cruel and unusual punishment. *Id.* at 667. This distinction was further refined in *Powell v. Texas*, 392 U.S. 514, 532-34 (1968), where the Court explained that although status may not be criminalized, acts undertaken as a result of that status may be. There the Court upheld Powell's arrest for appearing drunk in public because

---

[9] The proscription against penalizing for ideas alone has been recognized for centuries, *see* 4 William Blackstone, Commentaries on Laws of England, 21 (1765) ("[N]o temporal tribunal can search the heart, or fathom the intentions of the mind, otherwise than as they are demonstrated by outward actions, it therefore cannot punish for what it cannot know."), and is reflected in modern codifications of the common law, *see* Model Penal Code and Commentaries, Comment to § 2.01 at 214-15 (1985) ("It is fundamental that a civilized society does not punish for thoughts alone.").

the Texas law did not sanction Powell merely for his status as an alcoholic, but for his act of overimbibing in public. *Id.* at 535-36. The Court rested its holding on the fact that Powell voluntarily committed sanctionable conduct: "The entire thrust of *Robinson's* interpretation of the Cruel and Unusual Punishment Clause is that criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some *actus reus*." *Id.* at 533. *See also United States v. Black*, 116 F.3d 198, 200-01 (7th Cir. 1997) (conviction for distribution, receipt, and possession of child pornography did not violate the Eighth Amendment despite plaintiff's contention of his status as a pedophile). Here Doe has committed no such act.

The dissent argues that Doe's steps of driving to the park and watching children constitute punishable action. Yet the circumstances make clear that the ban order issued by the City resulted from its concern about Doe's fantasies about children. The City did not receive any complaints from the children in the park, and it does not allege that anyone was at all affected by Doe's presence there. Presumably, untold numbers of Lafayette residents wander the City's parks every day, many of them potentially thinking offensive or objectionable thoughts. Despite the prevalence of his behavior, only Doe has been banned from the park for it. The City has not suggested that it monitors sex offenders' presence in the City parks, and it could not cite any other example of an individual banned for mere presence in the park. The City does not dispute that it is Doe's thoughts that distinguish him from all other park users.

What is more, Doe's behavior does not rise to the level of an action of sufficient gravity to justify punishment. The error in punishing actions similar to Doe's is more easily seen by way of analogies removed from the sensitive

context of child molestation. By way of comparison, we would not sanction criminal punishment of an individual with a criminal history of bank robbery (a crime, like child molestation, with a high rate of recidivism, *United States v. Pirovolos*, 844 F.2d 415, 416 n.1 (7th Cir. 1988)) simply because she or he stood in the parking lot of a bank and thought about robbing it. It goes without saying that in this hypothetical the individual would not have taken an action that could support punishment. Or, as a different example, punishment of a drug addict who stands outside a dealer's house craving a hit but success-fully resists the urge to enter and purchase drugs would be offensive to our understanding of the bounds of the criminal law. *See Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67-68 (1973) ("The fantasies of a drug addict are his own and beyond the reach of government, but govern-ment regulation of drug sales is not prohibited by the Constitution.") Despite the City's suggestions at oral argument, both of these situations, analogous to the ac-tions taken by Doe here, present clear examples of ac-tions that do not reach a level of criminal culpability necessary to justify punishment.

As these illustrations suggest, Doe's behavior may also be understood as the kind that does not come close to what we recognize as punishable under the theory of attempt. Under Indiana law, a person commits attempt when, acting with culpability necessary to commit the crime, he or she "engages in conduct that constitutes a substantial step toward commission of the crime." Ind. Code § 35-41-5-1. Here, the most that can be said of Doe's action is that he drove to the park and watched children. Even if we assume Doe intended to molest chil-dren when he stood in the park, Doe's mere presence in the park is not enough to constitute a "substantial step" towards an attempted sex offense. *See State v. Kemp*, 753 N.E. 2d 47, 51 (Ind. Ct. App. 2001) (affirming dismissal of

attempted child molestation charge when defendant allegedly agreed to meet minor at restaurant parking lot, drove there, and brought condoms because conviction would result in "no limit on the reach of 'attempt' crimes"). In the same way that the individual with a history of robbing banks could not be charged with attempted bank robbery for standing across the street from the bank and thinking about robbing it, Doe may not be punished for merely thinking perverted thoughts about children. *See, e.g.*, *United States v. Monholland*, 607 F.2d 1311, 1318 (10th Cir. 1979) (holding that mere intent to commit a crime is not sufficient to constitute attempt).

Finally, Doe's conduct is not akin to stalking, which, while perhaps motivated by thoughts, requires actual threatening conduct by the stalker. Stalking statutes typically require that a defendant 1) knowingly or intentionally; 2) engage in a course of conduct involving continuous or repeated harassment; 3) that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened; and 4) actually causes that person to feel terrorized, frightened, intimidated, or threatened. *See, e.g.*, Ind. Code § 35-45-10-1. Doe's actions do not come close to criminal conduct punishable as stalking. He did not "continually" or "repeatedly" go to the public park; his ban order was based on a single visit. *See Landis v. State*, 704 N.E.2d 113, 113 (Ind. 1998) (holding that "the crime of stalking by its nature necessitates proof of repeated or continuing acts"). Nor did Doe's gaze or proximity cause any specific person to feel frightened or threatened; indeed, there is no evidence that anyone even *noticed* Doe's presence. *Frazier v. Delco Elecs. Corp.*, 263 F.3d 663, 668 (7th Cir. 2001) ("The stalking victim who doesn't know that she is being stalked is not in fear of being injured."). Most importantly, Doe's conduct—going to a public park with improper thoughts about children previously unknown to him—did not harm any of the youths in the

park, unlike the terror caused by actions criminalized as stalking.[10]

We are acutely aware of the critical problem of sex offenses against children. We find the substance of Doe's sexual fantasies about children repugnant and deplorable. But, of course, the fact that this court or the City of Lafayette finds Doe's thoughts offensive does not limit the amount of First Amendment protection they are afforded. *See Free Speech Coalition*, 535 U.S. at 245 ("It is also well established that speech may not be prohibited because it concerns subjects offending our sensibilities."); *Am. Booksellers Assoc. v. Hudnut*, 771 F.2d 323, 327 (7th Cir. 1985) ("Under the First Amendment the government must leave to the people the evaluation of ideas."); *Collin v. Smith*, 578 F.2d 1197, 1200 (7th Cir. 1978) (noting that the First Amendment protects covered speech even though it may be "repugnant to the core values held generally by residents of this country"). Despite our repudiation of the content of his thoughts, the City of Lafayette may not punish Doe for this thinking alone, for without protection from government intrusion into our thoughts, the freedoms guaranteed by the First Amendment would be meaningless.

---

[10] *See, e.g.*, *Garza v. State*, 736 N.E.2d 323, 325 (Ind. Ct. App. 2000) (despite several requests to be left alone, stalker repeatedly contacted victim, sent her flowers with a message that began "hate, anger, bitterness, malice, venom, hellish prisons of our own making," and joined her health club); *Johnson v. State*, 721 N.E.2d 327, 330 (Ind. Ct. App. 2000) (stalker threatened to kill former girlfriend, flattened her car tires, and came to her home on many occasions, including three separate times the night he was arrested); *Waldon v. State*, 684 N.E.2d 206, 207 (Ind. Ct. App. 1997) (despite existence of restraining order, victim encountered stalker on at least six separate occasions near her dance studio within one-year period).

### III. CONCLUSION

Accordingly, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.

RIPPLE, *Circuit Judge*, dissenting.  The majority invalidates the City of Lafayette's ("the City" or "Lafayette") action because, in its view, the ban order against Mr. Doe violates the First Amendment.[1] In my view, the City has adopted a reasonable proscription designed to protect a vulnerable part of the population, its children, against the danger of a relapse by Mr. Doe. Therefore, I respectfully dissent.

The majority and Mr. Doe base their position on the conclusory proposition that banning Mr. Doe from the park constitutes "punishment" for "pure thought." *See* Appellant's Br. at 9. This view requires that we close our eyes to Mr. Doe's actions in that park in January of 2000. It also requires that we give short shrift to Mr. Doe's condition as an admitted pedophile who, despite some progress in dealing with his condition, continues to have

---

[1] As the district court and the majority note, Mr. Doe does not challenge the procedures that led to the ban. For purposes of this appeal, therefore, we must assume, without deciding, that the ban was adopted in full compliance with the requirements of procedural due process. Mr. Doe also does not contend that the ban is overbroad. Like my colleagues, I am puzzled by Mr. Doe's decision not to raise the issues of procedural due process and overbreadth in this appeal.

difficulty controlling his urges.[2] Indeed, it is difficult to see how the City's ban impacts expression protected by the First Amendment. Not only was Mr. Doe's conduct lacking the expressive element necessary to invoke the First Amendment's protection, but his thoughts, if expressed, would fall into categories of expression the Supreme Court has held to be unprotected.

## A.

The majority opinion rests on the assumption that the ban punishes Mr. Doe solely for his thoughts. In support of that characterization, Mr. Doe relies on the unexceptional proposition that "it would be nonsensical to extend the protection of the Constitution to speech, but allow the government to invade thoughts." Appellant's Br. at 9. In my view, our concern here ought to be stated in terms that recognize, more comprehensively and pragmatically, the actual situation confronting the City as well as the parents and children who look to that City for protection as they go about their every day activities. This case is not about Mr. Doe's thoughts. It is about the danger he presents to the children when, because of these thoughts, he goes to the park to be near children and to achieve sexual gratification. Mr. Doe and the majority take the position that the First Amendment requires that the City admit him to its public parks while knowing that he poses an immediate safety threat to the children there.

---

[2] It is important to note that Mr. Doe acknowledges that he will never be cured of his pedophilia and that a successful recovery will mean that he has learned to control his urges, not that those urges have gone away. Mr. Doe, therefore, is more likely to act on such urges than individuals without this affliction. Notably, he has three convictions for sexual offenses against minors.

My colleagues write that the ban punishes Mr. Doe for his fantasies and therefore punishes him for "pure thought." Such a characterization might be accurate if Lafayette had banned him from public parks because he had admitted to having sexual fantasies about children in his home. But Mr. Doe did not simply indulge such fantasies in his own home. Nor did he go to the park simply to think and contemplate. He entered the park in search of sexual gratification induced by the children playing there. Mr. Doe did not simply entertain thoughts; he had sexual urges directed toward children, and he took several steps toward gratifying those urges. He went to not one, but two parks[3] in search of children at play in order to achieve sexual gratification. At the second park, he spent between 15 and 30 minutes observing children at play, and consequently became sexually aroused.[4] In short, he engaged not only in thought but in activity directed toward an illegal and very harmful end. The City's focus in implementing the ban was Mr. Doe's actions—directed toward this dangerous, illegal and harmful end. The City restricted Mr. Doe's ability to enter public parks where children are often unsupervised because Mr. Doe went to a park for the purpose of sexually gratifying himself by his proximity to children.

The City has not tried to curb Mr. Doe's thoughts. It has not enacted an ordinance banning Mr. Doe, or any other

---

[3] The transcript of Mr. Doe's deposition is clear that Mr. Doe drove first to one park (Columbian) and then a second (Murdock). Mr. Doe characterized his activity as "cruising." R.23, Attachment 4 at 28. When the City's attorney asked for clarification, Mr. Doe admitted that he was "mostly" looking for children. *Id.*

[4] Mr. Doe stated that seeing the children in the park caused him to have thoughts "about the possibility of, you know, having some kind of sexual contact with the kids." R.23, Attachment 4 at 29.

individual, from having sexual fantasies about children. Lafayette is justifiably concerned with Mr. Doe's efforts to act on those thoughts and, therefore, with his proximity to unsupervised children. Mr. Doe's actions in January of 2000 demonstrate that his recovery is incomplete and that there is a very real possibility of a future assault. Thus, upon learning of Mr. Doe's trip to Columbian and Murdock Parks in response to his sexual desires, Lafayette banned Mr. Doe from city parks. The Lafayette School Corporation also banned Mr. Doe from its premises, a ban that Mr. Doe does not challenge. Both of these restrictions are reasonable preventative measures designed to keep Mr. Doe away from locations where unsupervised children may be present.

Mr. Doe contends that he is being singled out for this treatment. He points to the many convicted sex offenders living in the Lafayette/West Lafayette area who are not banned from public parks and claims that the City's action is therefore arbitrary. According to the record in this case, however, the City does not have knowledge that relapses or near-relapses involving other sex offenders have occurred on city property. There is certainly no indication in the record that Lafayette would respond to any other similar case in a different manner. By his own admission, Mr. Doe had entered the park for the purpose of obtaining sexual gratification by observing children. The City certainly need not act in an ostrich-like fashion with respect to this information. It had an obligation to act prudently.

Mr. Doe contends that "[i]t surely would be safer for the City of Lafayette if it could enter the thoughts of every citizen to try to determine the potential for criminal activity . . . . Such a broad brush approach would banish many innocent persons because of thoughts that would never blossom into reality." Appellant's Br. at 14. This submission might be apt if Lafayette had adopted an ordinance

banning all individuals who had sexual fantasies about children from entering public parks. But the City was entitled to take into consideration the reality that, unlike most individuals who have such fantasies, Mr. Doe poses, by his own admission, a far greater probability of acting on those fantasies and endangering the children. As Justice Holmes wrote, "the character of every act depends upon the circumstances in which it is done." *See Schenck v. United States*, 249 U.S. 47, 52 (1919). We cannot accurately assess the City's action without taking into account Mr. Doe's pedophilia. This affliction certainly ought not doom him to permanent exile from society. Nor may society, acting through the government, harass or marginalize him. His actions do, however, render reasonable some restrictions that would be inappropriate if applied to someone without such a history.

The law has long recognized that not every individual is equally capable of controlling his desires and preventing them from becoming actions that endanger others. Here, we have an individualized finding, based upon an admission, that Mr. Doe belongs to that group of persons who are more susceptible to having sexual desires with respect to children *and* to acting on those urges. The City of Lafayette has a compelling interest in protecting children from these individuals. Mr. Doe moved beyond a momentary desire to seek sexual gratification from children to a calculated effort to act on those desires. The fact that, on that particular day in January 2000, the sexual gratification took the form of merely observing the children at play is fortunate for those children and for Mr. Doe.[5] It does not change, however, the fact that his urge, at least for an hour or so, was able to overpower his

---

[5] Mr. Doe testified that, while in the park he said to himself, "I've got to get out of here before I do something . . . ." R.23, Attachment 4 at 27.

ability to control it. The City of Lafayette did not violate his First Amendment rights by taking the action that it did to protect its children. It need not expose the children to the risk that, on a future date, Mr. Doe's loss of control will be as short-lived.

**B.**

I cannot fault our colleague in the district court for determining that Mr. Doe was not involved in any conduct protected by the First Amendment. He did not go into the park to advocate the legalization of sexual relations between adults and minors. He did not go into the park to display a sculpture, read a poem or perform a play celebrating sexual relations between adults and minors. Instead, he went to two parks in Lafayette, stopping at the second, to observe children at play in order to gratify the sexual urge he felt as he was driving home from work. He was aware of his propensity in this regard and indeed of his history of sexual assault. Nevertheless, he engaged in a sort of psychiatric brinksmanship by placing himself in a situation that increased substantially the possibility of his acting on these impulses. I cannot join the majority in believing that this conduct is somehow deserving of First Amendment protection.

Expression is a crucial element of a First Amendment claim.[6] The presence of expressive content can transform a

---

[6] Although not relevant to our decision today, the First Amendment also protects the right not to express one's beliefs or affiliations. *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("We begin with the proposition that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."). Additionally, the First Amendment

(continued...)

garden variety violation of federal law into an act requiring constitutional scrutiny. *See United States v. O'Brien*, 391 U.S. 367, 376 (1968) (articulating and applying a four-part test to determine whether federal law forbidding the destruction of draft cards violated the First Amendment; one element of that test requires that the stated governmental interest in regulating the conduct be "unrelated to the suppression of free expression"); *see also Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986) (stating that constitutional scrutiny will be applied "only where it was conduct with a significant expressive element that drew the legal remedy in the first place"). The infusion of expressive content into the normal human function of sleeping can create a federal case requiring the Supreme Court's resolution. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 292-93 (1984) (accepting, without deciding, the Court of Appeals' conclusion "that overnight sleeping in connection with the demonstration is expressive conduct protected to some extent by the First Amendment"). Expression, in all its forms, is the lynchpin of the First Amendment's guarantee of free speech. Indeed, the Supreme Court of the United States has read the protections of the First Amendment broadly, extending this important guarantee to protect a variety of situations, including the reading of obscene materials in one's home, *see Stanley v. Georgia*, 394 U.S. 557 (1969), symbolic expression, *see Cohen v. California*, 403 U.S. 15 (1971), profanity, *see Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495 (1952), lewd expression, *see Hustler Magazine v. Falwell*, 485 U.S. 46 (1988), and flag burning, *see Texas v. Johnson*, 491 U.S. 397 (1989).

---

[6]  (...continued)
protects an individual's rights of freedom of association and of privacy by protecting the confidentiality of group membership lists. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958).

Although the Court has protected all manner of offensive and degrading expression, it has never seen fit to extend the protections of the Amendment to non-expressive conduct. The First Amendment is not implicated when the government seeks to regulate activity which "manifests absolutely no element of protected expression." *See Arcara*, 478 U.S. at 705. The Court also has noted that "it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive." *Cmty. for Creative Non-Violence*, 468 U.S. at 293 n.5. This emphasis on expression as the threshold factor in determining the applicability of the First Amendment runs throughout our free speech jurisprudence. *See* Laurence Tribe, *American Constitutional Law* (2d ed. 1988) at 785 (chapter covering First Amendment's protection of speech entitled "Rights of Communication and Expression").

Even if I could accept that First Amendment concerns are somehow at stake in Mr. Doe's situation, his claim would still fail because it implicates at least two areas that the Supreme Court has declared to be unprotected by the First Amendment's free speech guarantee. *See Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-72 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words . . . .").

First, assuming *arguendo* the applicability of the First Amendment, Mr. Doe's urges were, in a very real sense, "directed to inciting or producing imminent lawless action and [were] likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Mr. Doe was, in essence, inciting himself to unlawful action. He knew of his propensity to such urges and he neverthe-

less took steps not to curb them but to encourage them. The judiciary has been reluctant to uphold restrictions on pure speech when the state argues that the speech could be proscribed because it was likely to incite others to action. *See Johnson*, 491 U.S. at 409 ("Thus, we have not permitted the government to assume that every expression of a provocative idea will incite a riot, but have instead required careful consideration of the actual circumstances surrounding such expression . . . ."). Part of the reasoning of these decisions is that impassioned speech will prompt citizens of a free and democratic society to reflect and to respond: "[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). Here, the audience is not a rational electorate who is able to evaluate and formulate a measured response; no mind other than Mr. Doe's fuels this urge and decides whether to act upon it.

Mr. Doe's urges, *if* considered expression, also would constitute obscenity, and not be deserving of Constitutional protection. *See* Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* (3d ed. 1999) § 20.56 at 708-09. Indeed, the Supreme Court has distinguished between child pornography and pornography featuring adults. *See Osborne v. Ohio*, 495 U.S. 103, 109-11 (1990) (holding that government interests prohibiting the possession of child pornography are much stronger than those supporting the prohibition of pornography generally). States are permitted to prohibit the possession and distribution of child pornography that does not meet the constitutional standard for obscenity. *See New York v. Ferber*, 458 U.S. 747, 756 (1982).

Attempting to analyze, even hypothetically, Mr. Doe's situation in terms of the First Amendment points up the

futility of such an exercise. The plain reality is that Lafayette's ban is not directed toward the damage done by Mr. Doe's thoughts but rather toward the action that accompanied them and the even more dangerous actions that might accompany future episodes. In short, the City's ban is not aimed at any communicative impact of Mr. Doe's thoughts; it is aimed at Mr. Doe's actions and the threat he poses to children playing in Lafayette's public parks. *See Arcara*, 478 U.S. at 704-05; *see also* Tribe, *supra* at 791-92.

### C.

Banning Mr. Doe from Lafayette's parks will not restrict the flow of information and ideas. Nor will it prevent him from participating in public life or realizing his potential as an individual. I do not believe the First Amendment argument submitted by Mr. Doe has any merit. Accordingly, I must respectfully dissent.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*